IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

BERTUCCI V. BERTUCCI

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

NICHOLAS BERTUCCI, APPELLEE,

V.

BRANDY BERTUCCI, APPELLANT.

Filed July 2, 2024.    No. A-23-559.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

James H. Hoppe, of Law Office of James H. Hoppe, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

INTRODUCTION

Nicholas Bertucci and Brandy Bertucci, now known as Brandy Miller, were married in July 2021, they separated in May 2022, and the Lancaster County District Court dissolved their marriage in June 2023. Brandy appeals the district court's decree, as amended; she disagrees with the court's decision not to award her any marital equity in the home Nicholas owned before their marriage. She also contends that the court erred in overruling a relevancy objection, and in failing to award her alimony and attorney fees. We affirm.

BACKGROUND

Nicholas and Brandy met "through FaceBook" about a year and a half before they were married on July 11, 2021. Brandy, age 40 at the time, moved from New Orleans, Louisiana, to Nebraska, with her teenage son "in the middle of August 2021." Nicholas, age 36 at the time, was

- 1 -

living in Lincoln, Nebraska; Nicholas had three children from a previous marriage. No children were born to the parties during their marriage to each other.

The parties "met online right around the time" Nicholas found a house to purchase in Lincoln on "Winchester South" (Winchester property). Nicholas purchased that property in April 2020 without a mortgage, using his own funds and money provided to him by his parents to pay the full purchase price. Within 5 months after the parties married, a quitclaim deed was executed conveying joint title of the Winchester property to Nicholas and Brandy.

The parties separated on May 26, 2022, less than a year after they married. The parties alluded to a protection order entered at that time, which excluded Nicholas from the Winchester property and left Brandy in sole possession of the home. Nicholas filed a complaint for dissolution of marriage on June 30. Trial took place in January 2023. We will set forth the evidence as needed in our analysis below.

In its decree on June 5, 2023, and as pertinent to the issues raised on appeal, the district court "set off" to Nicholas the Winchester property subject to existing liens, debts, taxes, and encumbrances. Nicholas was ordered to remove Brandy's name from any obligations related to the property within 60 days and Brandy was ordered to "promptly execute a Quitclaim Deed in favor" of Nicholas. Based upon the allocation of marital assets and debts, Nicholas was ordered to pay Brandy an equalization judgment of $828.10 within 60 days of entry of the decree. Neither party was awarded alimony, and each party was ordered to pay their own attorney fees and costs.

Brandy filed a "Motion to Alter or Amend Judgment" on June 14, 2023, generally asserting that the decree was "not sustained by the evidence and [was] contrary to law." At the hearing on the motion, Brandy's counsel argued solely about the Winchester property, asserting that Nicholas failed to satisfy his burden of proving that the property was nonmarital. Brandy's counsel argued that the district court "did not make a finding in its decree that this property was non-marital"; "[i]t simply said it shall be . . . set aside to [Nicholas]." The district court entered an "Amendment to the Decree" on June 23 "to explicitly state its finding that the . . . [Winchester property] . . . was found to be non-marital property." It added that "[a]ll other findings and orders of the Decree of June 5, 2023, are incorporated herein and remain as set forth therein."

Brandy timely appealed from the amended decree.

ASSIGNMENTS OF ERROR

Brandy assigns that the district court erred by (1) implicitly determining that the Winchester house was Nicholas' nonmarital property and not equitably dividing it, (2) not awarding alimony to her, (3) not awarding attorney fees to her, and (4) overruling her relevancy objection at trial related to a question she was asked in her deposition.

STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## ANALYSIS

### WINCHESTER PROPERTY

Nicholas purchased the Winchester property for $267,000 in April 2020, and according to Nicholas, it was a cash transaction. He contributed "roughly" $140,000 to the purchase, and his parents provided "about . . . $125,000." Nicholas and his parents had an "informal agreement" that Nicholas would pay them back if he could; he "took it upon [himself]" to pay his parents $1,000 a month when he moved into the home. However, he did not make payments to his parents during his marriage to Brandy.

According to Nicholas, about 5 months after he and Brandy were married, his mother urged him to put Brandy on a joint tenancy deed. Since Nicholas, a traveling nurse, was commuting to work out of town, his mother was concerned about what would happen with the house if something happened to Nicholas. Nicholas claimed that Brandy also asked him to put her on the "title of the home." He also claimed that doing so was not intended to be a gift to Brandy. Nicholas stated that Brandy "pressured" him to execute a quitclaim deed and that she made the appointment with the title company to get it done. A quitclaim deed executed by both parties and a "Real Estate Transfer Statement" were received into evidence and both documents are dated December 10, 2021. Nicholas testified that no improvements were made to the home during the marriage.

Nicholas' mother, Ruth Bertucci, testified that she and her husband provided $125,000 to Nicholas when he purchased the Winchester property in 2020. Ruth said that she told Nicholas he needed to "be sure the house is in the proper name so that if something happens to [him], [he would not] just lose the house, the house isn't just lost." She was "very concerned" about Nicholas working as a traveling nurse in Fremont, Nebraska, and she had been with him there on "a small country road or . . . farmland, hills." She was concerned about him "going very early in the morning, working long hours, coming home late at night, that something may happen." She recalled Brandy talking to her about Nicholas owing them for the house, and that it was her debt, too, since she and Nicholas were married. Ruth told Brandy it was "not [her] concern" and that Ruth and her husband helped their children and grandchildren "in any way that [they] can." When asked if a gift was made to Brandy "of anything," Ruth responded, "No, sir."

When Brandy was asked if she made any structural improvements to the Winchester property, she responded that she had "changed out some light fixtures, some outlets, and that's about it, as far as structure." Brandy acknowledged that she did not make any monthly payments to any person related to any loan on the house. Her recollection regarding any incumbrances against the house was that Nicholas and his mother told her that he had a loan to his parents, "but we've come to find out that that's not even real." Brandy claimed that "right after Christmas" when she and her son and Nicholas were at Nicholas' parents' "Tide Water property," there "was this big ordeal of them gifting us paying off the loan so that we were debt free." According to Brandy, Nicholas' parents "acted like they were gifting us the rest . . . releasing us from the debt that we owed them on our home, so they gifted us, to be debt free, . . . you know, they paid off the loan." She acknowledged that when the quitclaim deed was executed that Nicholas did not call it a gift,

but that "he conveyed the property because I was leaving my entire family and friends." Brandy stated that when she and Nicholas discussed the quitclaim deed "he had said it's -- it's not mine, but in my mind, when we're coming into marriage, it's all of ours, and that includes, like, payments, loan payments on the home that I'm living in."

Brandy denied putting pressure on Nicholas to make her a joint tenant on the property; she claimed "[t]here was no need for that" because it was something he wanted to do. Brandy did not recall whether she or Nicholas called the title company to prepare the necessary documents. On cross-examination, she was asked about her prior deposition testimony, specifically, when she was asked whether Nicholas made any statements to her about "'making a gift to [her] of half of the house?'" Her response was, "'I don't see it as a gift. I see it as partners coming together as one and owning property together.'"

We initially observe that at the time Nicholas married Brandy, all equity in the Winchester property was nonmarital and could be properly set aside as Nicholas' separate property. See *Parde v. Parde, supra* (equity in property at time of marriage is nonmarital asset which, if established, should be set aside as separate property). Once married, as a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003). Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Parde v. Parde, supra.* The original value of an asset may be nonmarital, while all or some portion of the appreciation of that asset may be marital. *Id.* The appreciation or income of a nonmarital asset during the marriage is marital insofar as it was caused by the efforts of either spouse or both spouses. *Id.*

There is no evidence of marital appreciation of the Winchester property during the course of this very short-term marriage. The only evidence of the current value of the Winchester property was offered via a 2022 "Lancaster County Appraisal Card," which showed a total value of $247,700 in 2021 and 2022, which is less than the $267,000 that Nicholas paid for the property in 2020. Accordingly, there was no appreciation in the value of the Winchester property that could be classified as marital, and therefore, the law supports the district court's decision to classify the entire property as nonmarital. See *Parde v. Parde, supra*.

However, Brandy claims Nicholas conveyed the property to her and Nicholas jointly, and therefore, it should be deemed marital property and should be equitably divided. At trial, Brandy testified that she felt obligated on the debt owed to Nicholas' parents because she and Nicholas "were a unit and, as a responsible adult," she wanted to be sure they were paying his parents. She acknowledged that no payments had been made during the marriage. However, she claimed that Nicholas' parents released them from the debt owed on the home. Brandy acknowledged that when the quitclaim deed was executed for the Winchester property, "[i]t was never called a gift." But she believed it was a "conveyance of property because of [her] completely re-locating, . . . thousands of miles away, and leaving everything." She did not "'see it as a gift,'" but as "'partners coming together as one and owning property together.'"

Nicholas claimed that his mother and Brandy asked him to put Brandy on the "title of the home," but that it was not intended to be a gift to Brandy. Nicholas stated that Brandy "pressured" him to execute a quitclaim deed and that she made the appointment with the title company to get it done. Nicholas denied making a gift "of anything" to Brandy. Nicholas' mother testified about

her concerns with Nicholas working as a traveling nurse in Fremont. According to Ruth, she told Brandy that she did not want Brandy to be concerned about the money Nicholas owed them; however, there was no gift to Brandy.

In the decree, the district court "set off" to Nicholas the Winchester property subject to existing liens, debts, taxes, and encumbrances. Brandy was ordered to "promptly" execute a quitclaim deed. In its subsequent amendment to the decree, the court "explicitly" stated "its finding that the . . . [Winchester property] . . . was found to be non-marital property."

On appeal, Brandy argues that the district court erred in determining that the Winchester property was nonmarital "because Nicholas' execution of the quitclaim deed was the manifestation of his clear and unambiguous intent to convey the real estate to him and Brandy jointly, when considered with the evidence and the circumstances surrounding its execution, and Nicholas' own complaint." Brief for appellant at 15. Notably, "Brandy does not contend that the Winchester [property] . . . is marital *solely* because Nicholas executed the quitclaim deed." *Id*. at 20 (emphasis in original). "Rather, Brandy contends simply that the execution of the quitclaim deed by Nicholas, and the recording of it with the Register of Deeds, along with the real estate transfer statement, was the manifestation of his clear and unambiguous intent to convey the real estate to him and Brandy jointly." *Id*. Brandy also argues that Nicholas "judicially admitted" that the Winchester property was marital property when he generally alleged in his complaint that the parties had acquired an interest in "***real*** and personal property." *Id*. at 21 (emphasis in original).

Nicholas argues that because he owned the Winchester property "free and clear at the time of marriage, the residence was, by definition, 'non-marital property.'" Brief for appellee at 6. He also emphasizes that there were no improvements made to the property nor any payments made against it, therefore Nicholas' nonmarital property was not comingled to where it "lost its non-marital nature." *Id*. at 7. He points to case law for the legal proposition that "[t]he manner in which property is titled or transferred by the parties during the marriage does not restrict the trial court's determination of how the property will be divided in an action for dissolution of marriage." *Schuman v. Schuman*, 265 Neb. at 469, 658 N.W.2d at 39.

Nicholas is correct that the parties' post-marriage decision to title the Winchester property in joint tenancy does not automatically convert a nonmarital asset into a marital asset. Even Brandy appears to concede this point based upon her argument that she is not contending that the Winchester property is "marital *solely* because Nicholas executed the quitclaim deed." Brief for appellant at 20 (emphasis in original). *Schuman* clearly rejected the notion that "nonmarital property which during a marriage is titled in joint tenancy cannot be considered as a nonmarital asset in an action for dissolution of marriage." *Id*. at 470, 658 N.W.2d at 39. Further, when considering how property was titled or described in assignment documents in a later case, the Nebraska Supreme Court stated that "the division of property must depend upon the facts of the particular case and the equities involved" and neither the trial court nor the appellate court "is restricted . . . to an analysis of the documents which, standing alone, are not conclusive." *Sellers v. Sellers*, 294 Neb. 346, 357, 882 N.W.2d 705, 713 (2016) (internal quotes and citation omitted). In *Sellers*, the Supreme Court found no error in the trial court's conclusion that the husband gifted certain business interests to his wife. It pointed out that the decision was "not based solely on the manner in which the property was titled or described in the assignment documents," but that there

- 5 -

was also testimonial evidence to support the trial court's decision, as well as "several references in the transfer documents describing each transfer as being a 'gift.'" *Id*.

In the present case, both Nicholas and his mother testified that there was never an intention to gift the Winchester property to Brandy. Even Brandy did not "'see it as a gift,'" but as "'partners coming together as one and owning property together.'" Brandy claimed Nicholas' parents released Nicholas and Brandy from "the debt that we owed them," which they "gifted us." And although she acknowledged the execution of the quitclaim deed "was never called a gift," she believed it was a conveyance of the property due to her relocating "thousands of miles away, and leaving everything."

Brandy contends *Bowen v. Bowen*, 29 Neb. App. 726, 959 N.W.2d 282 (2021), supports classifying the Winchester property as marital. She argues that "[w]hile there are differences from the instant case and *Bowen*, those differences simply cannot sustain an outcome where the real estate in *Bowen* is marital, but the real estate in the instant case is nonmarital." Brief for appellant at 18. She claims, "If anything, the evidence in the instant case is even stronger in favor of a finding that the real estate is marital." *Id*. We disagree.

In *Bowen, supra*, the parties were married for 8 years. The husband owned real estate from a prior marriage that was still encumbered by a mortgage; at his new wife's request, he executed a quitclaim deed adding her as a titleholder to that property. He claimed he did this because it was the right thing to do, not that he intended to gift his wife half the value of the property. Improvements were made to the property, and the husband told the wife she was "free to do what she wanted with her half of the property." *Id*. at 736, 959 N.W.2d at 289. Further, the parties worked together to improve the property, and there was no evidence regarding the value of the property or the mortgage balance as of the date of marriage. Although this court departed from the district court's reasoning for classifying the property as marital, this court nevertheless affirmed its decision. Relying on *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003), this court reiterated that these determinations depend on the facts and circumstances of each case. See *Bowen v. Bowen, supra*.

The facts and circumstances of this case support the district court's decision to classify the Winchester property as nonmarital. In the present case, the parties separated in less than 1 year of their marriage. The parties made no payments towards any obligation owed against the property. No improvements were made to the home. And there was evidence to support what Nicholas paid to purchase the home in 2020, as well as what the property was worth in 2021 and 2022. Further, there was conflicting evidence as to why Nicholas agreed to jointly title the property. The fact that the district court was more persuaded by the evidence presented by Nicholas does not amount to an abuse of discretion. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023).

Finally, we find no merit to Brandy's argument that Nicholas' allegation in his complaint constitutes a judicial admission that the Winchester property was marital. A judicial admission is a formal act done in the course of judicial proceedings which is a substitute for evidence, thereby waiving or dispensing with the production of evidence by conceding for the purpose of litigation that the proposition of fact alleged by the opponent is true. *Western Ethanol Co. v. Midwest Renewable Energy*, 305 Neb. 1, 938 N.W.2d 329 (2020). Similar to a stipulation, judicial

admissions must be unequivocal, deliberate, and clear, and not the product of mistake or inadvertence. *Id*. Pleadings and admissions therein may be superseded at trial, and issues set out in a pretrial order supplant those raised in the pleadings. *Boring v. Zoetis LLC*, 309 Neb. 270, 959 N.W.2d 795 (2021).

Nicholas generally alleged in his complaint that the "parties have acquired an interest in real and personal property and have incurred certain debts and an equitable division thereof should be made." As Brandy concedes in her brief, Nicholas did not specify any particular real property in that reference. And when questioned about that allegation during trial, Nicholas explained that he believed the phrase to encompass only personal physical property. We also observe that in Nicholas' pretrial memorandum, he identified the Winchester property as "nonmarital property." Finally, Nicholas' general reference to the parties having acquired an interest in real and personal property does not unequivocally admit that Brandy had any equitable interest in the Winchester property, even if she may have had a legal interest due to the execution of the quitclaim deed.

We also find no merit to Brandy's "final remark" regarding the district court's requirement that Brandy execute a quitclaim deed for the Winchester property in favor of Nicholas. Brief for appellant at 22. She contends that "[t]his is a ***fascinating*** requirement, because it strongly implies that the district court assigns significance to such an act." *Id*. (emphasis in original). She then states, "But if it is so significant, then why did the district court completely disregard Nicholas' execution of the quitclaim deed 18 months earlier?" *Id*. Brandy suggests the "simple answer" is that the court "was wrong in implicitly finding" the property to be Nicholas' nonmarital property. *Id*.

First, although the decree may have implicitly indicated the Winchester property was "set off" to Nicholas because of its nonmarital nature, the amended decree "explicitly" states the district court's finding that the Winchester property was nonmarital. And, as we have already discussed, the manner in which property is titled or transferred by the parties during the marriage does not restrict the trial court's determination of how the property will be divided in an action for dissolution of marriage. *Schuman v. Schuman, supra*. In this case, there was no abuse of discretion by the district court in classifying the Winchester property as Nicholas' separate nonmarital property for the reasons already discussed, and therefore, it was entirely appropriate for the court to require Brandy to execute a quitclaim deed to restore full title of the property to Nicholas.

ALIMONY

Brandy claims the district court should have ordered Nicholas to pay her alimony. While she acknowledges that "this was obviously a short marriage," she was "in clear need of support from Nicholas, as she had relocated with her minor child to live with Nicholas in Nebraska for the benefit of the marriage, leaving her family, friends, and jobs behind." Brief for appellant at 22. She states that she did not earn an income prior to separation "[a]t Nicholas' urging," and at the time of trial, she had just started earning $1,400 per month. *Id*. at 23. Nicholas testified that he earned "somewhere between" $65,000 and $75,000 per year as a traveling nurse. Brandy argues that the "relative economic circumstances" should have compelled the court to award Brandy "*some* alimony." *Id*. (emphasis in original).

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage,

(3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id.*

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.* Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Wiedel v. Wiedel, supra*. The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.*

Brandy had been "working in . . . respiratory therapy sales," but after arriving in Nebraska, she was working on building her business, earning about $1,400 per month by the time of trial. She testified that she and Nicholas agreed she would move to Nebraska since he had "three younger boys here that can't move," and he would support her so she could "run forward with [her] business and take care of the kids in the home." By moving to Nebraska, she could focus on her almost 17-year-old son, "the kids," and her business. She claimed Nicholas told her she "would never have to work a day in [her] life" and that he would support her and her son. She stated that Nicholas knew "how passionate [she was] about [her] mediumship and [her] holistic work," and that he "fully" supported it but that it was "like night and day" as to her having a home office. She had been "working hard . . . for the last three months, . . . and it's doing really well." Although she was earning $1,400 per month at the time of trial, she stated her holistic healing business was "growing" and that she would "thrive here." At trial, Brandy requested $1,000 per month in alimony for whatever period of time the district court "rules is fair."

Although we are mindful of the fact that Brandy moved from Louisiana to Nebraska to marry Nicholas, we cannot say that the district court's decision not to award alimony is untenable such as to deprive Brandy of a substantial right or just result. See *Wiedel v. Wiedel, supra*. The parties separated less than 1 year after they were married, there were no children born of the marriage, and Brandy testified that her holistic healing business was growing and that she would "thrive here." An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.* The court's decision regarding alimony was not patently unfair on this record.

### ATTORNEY FEES

Brandy submitted her attorney's affidavit in support of an award of attorney fees for $7,620. The district court ordered both parties to pay their own attorney fees and costs. On appeal, Brandy provides the following reasons in support of an attorney fee award at the trial level: "the unique situation presented by the protection order," the litigation over the Winchester property, and the "parties' relative economic circumstances." Brief for appellant at 23.

It has been held that in awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). The award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Id.*

The protection order was not tried in the present case, so the circumstances underlying that proceeding and any attorney fees associated with it were not at issue here. Brandy was not successful in her effort to claim a marital interest in Nicholas' nonmarital real estate, which was a primary issue litigated. The only reason offered by Brandy that might support an award of attorney fees is the parties' relative economic circumstances. It is true that Nicholas earned more income than Brandy, however, we conclude that this reason alone cannot overcome the district court's discretion in its decision not to award attorney fees.

RELEVANCY OBJECTION

In her final assigned error, Brandy claims the district court erred in overruling her relevancy objection during her cross-examination by Nicholas' attorney as set forth in the colloquy below.

[Counsel for Nicholas]: Ma'am, do you remember giving your deposition at my office?

[Counsel for Brandy]: Objection, relevance, whether she remembers it.

THE COURT: Overruled by the Court.

[Brandy]: Okay. I remember being in your office. Do I remember everything that was asked and answered? No.

[Counsel for Nicholas]: So, I'm placing --

[Brandy]: I don't recall.

[Counsel for Nicholas]: -- your deposition before you in order for you to refresh your recollection. Okay?

[Brandy]: Okay.

[Counsel for Nicholas]: Do you remember me asking you the question, "Did he make any statements to you indicating that he was making a gift to you of half of the house?"

[Counsel for Brandy]: Objection, relevance to whether she remembered making the statement.

THE COURT: Overruled. You can answer that.

. . . .

[Counsel for Brandy]: He has to ask her first whether she remembers it.

THE COURT: She testified she doesn't remember it.

[Counsel for Brandy]: Okay.

THE COURT: She doesn't remember everything she said in her deposition. He asked if seeing it would refresh her recollection. She said yes.

[Counsel for Brandy]: Okay.

. . . .

[Counsel for Nicholas]: Having looked at your deposition, do you recollect the answer that you gave?

[Brandy]: I do.

[Counsel for Nicholas]: What is the answer?

[Brandy]: It says, "I don't see it as a gift. I see it as partners coming together as one and owning property together."

Brandy argues that the district court "erred in overruling [her] relevancy objection, because whether she *remembered* Nicholas' counsel asking her any question in a deposition could not be less relevant to *any* fact of consequence in the case." Brief for appellant at 24 (emphasis in original). She contends that her answer, "'I don't see it as a gift. I see it as partners coming together as one and owning property together[,]'" was not "actually responsive to the yes or no question as to whether she remembered being asked in a deposition whether Nicholas made any statements to her indicating that he was making a gift to her of half of the house." *Id.*

Although evidence that is irrelevant is inadmissible, Neb. Rev. Stat. § 27-402 (Reissue 2016), the bar for establishing evidentiary relevance is not a high one. *Marr v. West Corporation*, 310 Neb. 21, 963 N.W.2d 520 (2021). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Rev. Stat. § 27-401 (Reissue 2016). To be relevant, the probative value of evidence need only be "something more than nothing." *State v. Lavalleur*, 289 Neb. 102, 115, 853 N.W.2d 203, 214 (2014). Furthermore, the exercise of judicial discretion is implicit in determining the relevance of evidence, and therefore a trial court's decision regarding relevance will not be reversed absent an abuse of discretion. See *Richardson v. Children's Hosp.*, 280 Neb. 396, 787 N.W.2d 235 (2010).

The cross-examination by Nicholas' attorney sought to elicit from Brandy that Nicholas never made any statements to her indicating that he was making a gift to her of the Winchester property. She had previously testified that she did not "see it as a gift." Since the Winchester property was otherwise established as nonmarital property at the time of marriage, and there was no evidence that the value of the property had appreciated during the marriage, Brandy's only equitable marital link to the property was by establishing Nicholas' intent to gift her an interest in the property, which we have previously addressed. Regardless of any questionable form of the challenged question, which was easily correctable, we find no abuse of discretion by the district court in overruling Brandy's relevancy objection.

CONCLUSION

For the reasons set forth above, we affirm the district court's June 5, 2023, decree, as amended on June 23, dissolving the parties' marriage.

AFFIRMED.